UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **ELDON PIERRE LEGER** | \* | **CIVIL ACTION NO. 08-1574** |
| **VERSUS** | \* | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | \* | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Eldon Pierre Leger, born August 3, 1953, filed an application for a period of disability and disability insurance benefits on August 15, 2006, alleging disability since October 19, 2000, due to a neck injury and paralysis on his left side.[1]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be reversed.

---

[1] The record shows that claimant had acquired sufficient quarters of coverage to remain insured through December 21, 2004. (Tr. 12). Thus, claimant must establish disability on or before that date in order to be entitled to benefits.

In fulfillment of F.R.Civ.P. 52, I find that this case should be reversed, based on the following:

**(1) Records from Dr. John Cobb dated June 25, 2001 to September 7, 2005**. On June 25, 2001, claimant reported injuring the left side of his neck at work on January 7, 1999. (Tr. 146). He had two neck surgeries in 1999. At the time he saw Dr. Cobb, claimant complained of occasional headaches, left neck and shoulder pain, numbness and tingling in his thumb and first two fingers of the left hand, and neck stiffness, especially with sitting.

On examination, claimant had mild impingement of the left shoulder, but no crepitation. (Tr. 147). Range of motion was essentially full, with complaints of tightness on the left with all movement. DTRs of the biceps, triceps, and brachioradialis were 2+ and equal. Motor and sensory function, as well as upper extremity strength, were normal.

X-rays of the cervical spine showed spondylosis with hypertrophy of the joints at C5-6 and C6-7. The left neuroforamen were open, without bony compromise on the left, and some narrowing on the right with no symptoms.

Dr. Cobb's impression was status-post posterior cervical fusion with persistent radicular type symptoms on the left suggesting C4-5. (Tr. 148). He opined that claimant might benefit from a dorsal column stimulator.

An MRI dated July 13, 2001, showed some bulging at C5-6 and C6-7. (Tr. 166). Dr. Cobb opined that claimant might need a fusion, and recommended discography of his neck to determine if he was a good candidate.

On August 28, 2002, Dr. Cobb reported that Dr. John Martin had done a percutaneous stimulator, which gave claimant significant relief. (Tr. 163). The plan was to prepare claimant for a permanent one.

On April 9, 2003, claimant still had a lot of neck and interscapular pain, with some numbness and tingling in the left arm. (Tr. 160). At that time, claimant was taking Nexium, Ambien, Zanaflex, Vioxx, Lorazepam, Oxycontin, and Ketoflex. Dr. Cobb stated that he did not "hold out a lot of hope for [claimant] improving with this nerve situation."

Claimant was still having a fairly significant degree of pain in the left arm on April 13, 2005. Dr. Cobb suggested a revision of the electrode. On June 30, 2005, Dr. Cobb implanted a dorsal column stimulator to relieve claimant's chronic cervical radiculitis and neuropathic pain in the left upper extremity. (Tr. 139). After that stimulator failed, Dr. Cobb removed it on July 19, 2005. (Tr. 135).

On August 10, 2005, Dr. Cobb reported that claimant's MRI showed a hot spot and some edema of his cord. (Tr. 151). Claimant still had some weakness in his left arm and pain. His gait pattern was a little uncoordinated, but improving.

His grip strength was fair, but his coordination of the intrinsics was slightly diminished. His edema at C4-5 was improving.

**(2) Records from Dr. John D. Martin dated October 28, 2002 to July 17, 2007**. On February 5, 2003, claimant complained of severe pain in his neck. (Tr. 277). He was despondent overall because of the lack of improvement of symptoms with his neurostimulator generator system. On examination, he had severe tenderness in the left levator scapulae at C5 and C7. Straight leg raises were negative.

Dr. Martin's impression was shoulder girdle enthesopathy, cervical radiculopathy, and gastric reflux disease. Claimant was tapered off of Neurontin, prescribed Zanaflex, Guanethidine and Ketoflex, and given a myofascial injection into the left levator scapulae. (Tr. 278-79).

On March 12, 2003, claimant reported an exacerbation of pain and swelling in his neck. (Tr. 273). Dr. Martin found that claimant had a disabling cervical spine condition which decreased his ability to function. (Tr. 275). He stated that claimant's condition precluded effective employment. He opined that claimant's prognosis was poor, and not expected to improve in the foreseeable future. Dr. Martin concluded that due to claimant's poor educational status, his potential for employment, even at a sedentary position, was poor.

On July 1, 2003, claimant continued to complain of neck and shoulder pain. (Tr. 263, 266). On examination, he is deep tendon reflexes were 2+ for the bilateral triceps and triceps brachii, 1+ for the bilateral biceps and right brachioradialis tendon, and 0 for the left brachioradialis tendon. Dr. Martin switched claimant's pain medication from Oxycontin to Avinza (morphine), instructed him on the side effects of his medications. (Tr. 264-65).

On October 8, 2003, claimant reported that his neck pain and shoulder symptoms had increased with cervical extension. (Tr. 256). He felt that he was not doing as well as he had done earlier that year. His medications had decreased symptoms to an extent, but his activity level was extremely limited. His medications included Avinza, Ketoflex, Ambien, Nexium, and Lorazepam.

On examination, claimant had severe tenderness in the left levator scapulae at the C7 level. (Tr. 257). He had 25% atrophy in the left deltoid muscle when compared to the right.

Dr. Martin's impression was cervical musculoskeletal disorder, post-cervical laminectomy pain syndrome, status-post spinal cord stimulator implantation, and anxiety disorder. (Tr. 257). Claimant was prescribed Zanaflex and Bextra, stopped on Lorazepam, and given myofascial injections.

On January 16, 2004, Dr. Martin reported that claimant had a paddle flat spinal cord stimulator in place which was not providing effective analgesia. (Tr. 254). The plan was to do a Pisces lead percutaneous trial, and do trigger point injections. (Tr. 200, 212, 223, 236, 243, 251).

On January 27, 2004, claimant's medications included Ambien, Nexium, Avinza, Ketoflex, Zanaflex, and Bextra. (Tr. 249). Bextra was discontinued in place of Arthrotec. (Tr. 250).

On October 20, 2005, claimant complained that his condition was significantly worsened after recent cervical surgery. (Tr. 199). His overall activity had been significantly curtailed, with severe pain, numbness, and shocking sensations with looking up and down. His hand grip had become severely weakened. The impressions were cervical radiculopathy, cervical myelopathy, anxiety disorder, and gastric reflex disease. (Tr. 200). He was prescribed a Medrol Dosepak and Lyrica, and referred for steroid injections. (Tr. 172, 188, 194). Dr. Martin opined that claimant was currently unfit for employment due to his disabling spinal condition.

An MRI scan showed spinal canal narrowing without spinal cord impingement; post-traumatic myelomalacia and syringomyelia at C4-5; small disc

protrusions at C4-5 and C5-6, and moderate right and mild left foraminal stenosis at C5-6. (Tr. 181). Surgery was not required to treat claimant's condition.

On July 12, 2006, claimant reported that his last injection was working fairly well with his medication and reduced activity. (Tr. 175). He still complained of weakness in the hands, especially on the left. He reported periodic depression and rare suicidal ideations without attempts. He believed that performing household chores and activity helped improve his strength.

On examination, claimant's hand grip strength was 3+ and symmetrical. His deep tendon reflexes were 2+, except for the left biceps tendon, which was at trace. (Tr. 176). He had no myofacial trigger points in the upper extremities or neck.

Dr. Martin's impression was post-cervical laminectomy pain syndrome, cervical musculoskeletal disorder, anxiety disorder, and gastric reflux disease. Claimant was restricted to sedentary activity, with the possibility of performing intermediate light duty activities depending on a specific job. He was prescribed physical therapy work conditioning. His future medical management was anticipated to require three epidural steroid injections and one to two trigger point injections annually. His medications were expected to continue indefinitely.

On June 5, 2007, claimant complained of neck pain extending into his arms and occasionally into both legs. (Tr. 312). His left hand was completely numb to light touch and pinprick sensation, and his right hand had diminished light touch sensation in the first, second, and third fingers, and absent light touch and pinprick sensation in the fourth and fifth fingers. He dropped objects in his left hand unless he was focused or looking at his left hand. He stated that his pain medications were more effective with an epidural injection. He still had severe insomnia and moderate to severe depression. His medications included Lyrica, Ultram ER, Duragesic, Skelaxin, Ambien, Doxepin, and Carafate.

On examination, claimant was mild to moderately depressed. (Tr. 313). His gait was symmetrical. He had slight atrophy of the left upper arm. The left brachioradialis and right biceps tendon was 1+, and the left biceps tendon was 0.

Dr. Martin's impression was cervical radiculopathy, syringomyelia at C4-5, probably post-traumatic, and anxiety disorder with depressed mood. His Doxepin was increased.

Claimant's work status was sedentary, with few exceptions at the light duty activity level which might require specific reviews and possibly a trial of return to work at those levels. (Tr. 314). He could not work at heights, with his hands above his head, or with heavy machinery.

**(3) Physical Residual Functional Capacity ("RFC") Assessment dated September 12, 2006**. Dr. Charles Lee determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 285). He could stand/walk and sit about six hours in an eight-hour workday. He had unlimited push/pull ability. He was limited as to reaching all directions, including overhead, and handling (gross manipulation). (Tr. 287). He was able to perform all routine self-care chores, cook, shop, and do light house work. (Tr. 289).

**(4) Psychiatric Review Technique dated September 12, 2006**. Joseph Tramontana, Ph.D., assessed claimant for anxiety-related disorders. (Tr. 292). He determined that claimant had mild restriction of activities of daily living and difficulties in maintaining social functioning. (Tr. 302). He had no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.

**(5) Consultative Orthopedic Examination by Dr. Stephen M. Wilson dated April 18, 2008**. Claimant complained of severe pain in the left side of his neck and left arm with numbness of the entire left arm, and some numbness in the right upper extremity in the index and middle fingers. (Tr. 456). He reported that he had had some difficulty with the lower extremities, but not for several months.

On examination, claimant was 5 feet 7 inches tall and weighed 130 pounds. (Tr. 457). He had some tenderness in the left side of his neck. He had full range of motion, but complained of pain in the left side of the neck and left arm. He had no swelling, inflammation, or muscle spasm.

Claimant had good range of motion in his shoulders, with pain on deep palpation. He had numbness of the left forearm, hand, and fingers, and in the index and middle fingers of the right hand. He had good circulation in the upper extremities, with no evidence of significant muscle atrophy. The left forearm was 1 cm smaller than the right.

Claimant had good grip strength. He reported weakness in the left upper extremity over the last several years. His reflexes were 3+ in the left upper extremity and 2+ in the right.

Cervical spine x-rays showed no fracture or dislocation. Claimant had some minimal spondylosis at C5-C6, and a laminectomy. An MRI dated August 26, 2005, showed a disc protrusion at C4-C5 with contact to the cord, a 9-mm area of encephalomalacia or synrix cavity, and generalized annular bulging at C5-C6.

An MRI dated February 4, 2008, showed a prominent area of altered signal within the spinal cord at C4-C5. (Tr. 458). The defect measured 2.3 cm, compared to 1 cm on the previous study. Claimant had foraminal narrowing bilaterally.

Dr. Wilson recommended a complete evaluation by a neurologist. He opined that "[d]ue to the fact that this patient is taking such large amounts of pain medication including Duragesic patches, hydrocodone, oxycodone and methadone, I doubt seriously that he would be able to return to return to any type of work." He stated that orthopedically, if the amount of pain medication could be reduced, then claimant could return to work that did not require lifting more than 10 pounds or more than 5 pounds on a regular basis with the left upper extremity. Dr. Wilson further said that claimant should return to activities that required no form of dexterity with the left hand. However, he suggested that claimant be thoroughly evaluated by a neurologist before returning to any type of work.

In the Medical Statement of Ability to do Work-Related Activities (Physical), Dr. Wilson opined that claimant could lift and carry up to 20 pounds occasionally, and sit, stand, and walk for eight hours without interruption. (Tr. 459-60). He could reach generally and overhead frequently with both hands, and occasionally handle, finger, and feel with the right hand. (Tr. 461). However, he could never handle, finger, or feel with the left hand. He could operate foot controls frequently.

Claimant could occasionally perform all postural activities, except that he could never climb ladders or scaffolds. (Tr. 462). He could occasionally work

around unprotected heights and moving mechanical parts, and operate a motor vehicle. (Tr. 463). He could tolerate loud noise frequently. He could perform all daily activities. (Tr. 464).

Dr. Wilson stated that claimant must get off of narcotic medications and see a neurologist before returning to work. He opined that claimant's limitations had lasted or would last for 12 consecutive months.

**(6) Claimant's Administrative Hearing Testimony**. At the hearing on March 5, 2008, claimant was 54 years old. (Tr. 27). He testified that he was 5 feet 7 inches tall, and weighed 175 pounds. (Tr. 28). He said that his weight had fluctuated since his surgery in 2005.

Claimant had a sixth-grade education. (Tr. 30). He had past work experience as a roughneck and a driller. (Tr. 31). He had stopped working after falling down on the job in 1999, injuring his rotary cuff and some discs in his neck. (Tr. 31-32). He had two neck surgeries, which gave him little relief. (Tr. 32).

Regarding complaints, claimant testified that he had back pain, leg numbness, and dizziness. (Tr. 36, 40). He stated that he was taking Lyrica and Tramadol, which did not really help much. (Tr. 40). He complained that moving around, sitting down, and walking aggravated his pain. (Tr. 41).

Regarding activities, claimant testified that he drove once or twice a week. (Tr. 29, 37). He stated that he "piddle[d] around the house." (Tr. 37). He reported that he mowed the lawn occasionally. He said that he had some rabbits and sheep to keep the grass down. (Tr. 38). Additionally, he had friends who stopped by his house to visit. (Tr. 39).

As to restrictions, claimant testified that he could lift 10 pounds with the left arm and 15 pounds with the right, but had no feeling in his hands. (Tr. 33). He said that he could walk about 500 feet. (Tr. 39). He reported that he could tie his shoelaces, but it took a little while. (Tr. 41). Additionally, he said that he could stand for about 30 minutes with a one-hour break, and sit for 20 to 30 minutes. (Tr. 45-46).

**(7) Administrative Hearing Testimony of Beverly Majors, Vocational Expert ("VE")**. Ms. Majors classified claimant's past work as a driller on a rig as medium with an SPV of six. (Tr. 49). The ALJ posed a hypothetical in which he asked the VE to assume someone of the claimant's age, education, and work experience; who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand, walk, and sit for six hours in an eight-hour workday; could not do over shoulder work; could do occasional handling and frequent fingering, and could not work at heights or around dangerous machinery. (Tr. 49-

13

50). In response, Ms. Majors testified that he could work as a light janitor, of which there were 238,800 positions nationally and 3,100 statewide; light information clerk, of which there were 75,000 positions nationwide and 957 statewide, and light interviewer, of which there were 117,900 positions nationally and 2,100 statewide.

      The ALJ changed the hypothetical to assume a claimant who was limited to sedentary work, and could lift about 10 pounds occasionally and five pounds frequently, and stand and walk for two hours in an eight-hour day, with the same non-exertional limitations. (Tr. 51). In response, Ms. Majors testified that he could work as a sedentary interviewer, of which there 41,000 jobs nationally and 745 statewide, and sedentary information clerk, of which there were 99,700 jobs nationally and 1,276 statewide. When the ALJ modified the hypothetical to assume that claimant could stand for a half-hour at a time, then had to take an hour break, the VE testified that no jobs would be available. She also confirmed that no jobs would be available for a claimant who had to take breaks like that three or four times a month.

      On cross-examination, claimant's attorney asked whether the jobs identified would be affected if claimant were limited as to reaching occasionally. (Tr. 52). In response, Ms. Majors stated that the receptionist and interview jobs would be

okay, but the other positions would be eliminated.  When he asked whether the information clerk and interviewer jobs would be impacted if claimant were limited as to occasional fingering with fine manipulation, she responded that they would. (Tr. 53-54).

**(8) The ALJ's Findings**.  Claimant argues that: (1) the ALJ erred in failing to properly consider all of claimant's severe impairments at Step 2 of the sequential evaluation process; (2) the ALJ erred in failing to find claimant disabled at Step 3 pursuant to listing 1.04A, and (3) the ALJ erred in failing to give proper weight to the findings of the treating and examining physicians, resulting in an erroneous assessment of claimant's residual functional capacity. Because I find that the ALJ erred in finding that he had the residual functional capacity to return to work during the relevant time period, I recommend that this case be **REVERSED**, and that claimant be awarded benefits commencing from the date of onset, which was October 19, 2000.

In the decision, the ALJ found that, through the date last insured, claimant had the residual functional capacity to perform modified light work, except for performing any over-the-shoulder work and a limitation to occasional handling. (Tr. 15).  This finding is unsupported by the opinion of claimant's treating physicians.

On March 12, 2003, which was prior to the date last insured, claimant's treating physician, Dr. Martin, stated that claimant had a disabling cervical spine condition which decreased his ability to function. (Tr. 275). He found that claimant's medical condition "precludes effective employment." He opined that claimant's prognosis was poor, and not expected to improve in the foreseeable future. Dr. Martin concluded that due to claimant's poor educational status, his potential for employment, even at a sedentary position, was poor. These opinions are fully supported by objective teat results and clinical examination.

Claimant argues that he meets the listing at § 1.04, which provides, in pertinent part, as follows:

> Disorders of the spine: (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
>
> With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 1.04.

Here, Dr. Cobb found that most of claimant's symptoms were related to nerve root compression. (Tr. 148). Claimant also presented with the remaining findings under the listing, including atrophy with muscle weakness and sensory or reflex loss. While the ALJ acknowledged Dr. Martin's report of atrophy in June, 2007, he stated that "[t]here is no mention of atrophy prior to the claimant's date last insured." (Tr. 15). The ALJ was incorrect. On October 8, 2003, which is prior to that date, Dr. Martin found that claimant had 25% atrophy in the left deltoid muscle when compared to the right. (Tr. 257).

Additionally, on July 1, 2003, which was also prior to the date last insured, Dr. Martin found that claimant had absent reflexes in the left brachioradialis tendon. (Tr. 264). He also determined on March 12, 2003, that claimant's grip strength was reduced, and that his cervical range of motion was restricted. (Tr. 274).

Further, the ALJ noted that while claimant was taking extensive pain medication at the time of Dr. Wilson's examination, that was "not necessarily the case" prior to his date last insured. (Tr. 17). However, the record consistently shows that claimant was taking strong pain medication prior to that time. On March 12, 2003, July 1, 2003, and October 8, 2003, claimant's medications included Neurontin, Oxycontin, Ativan, Lorazepam, Ambien and Avinza

17

(morphine).  (Tr. 256, 266, 276).  Oxycontin and Avinza are both narcotic pain medications for the relief of moderate to severe pain.  Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms."  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)).  The ALJ did not take the side effects of claimant's medications before claimant's date last insured into consideration, and his failure to do so was error.  (Tr. 17).

Accordingly, it is my recommendation that the Commissioner's decision be **REVERSED**, and the claimant be awarded benefits.  The undersigned recommends that and the claimant is awarded appropriate benefits commencing October 19, 2000, the date of onset of disability.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed January 25, 2010, at Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE